1
2
3
4
5
6
7

8    **UNITED STATES DISTRICT COURT**

9    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   MEMORIAL HEALTH SERVICES, et al.,    |    CASE NO. SA CV 16-0852-DOC (JCGx)

12                Petitioners and Plaintiffs,

13          vs.                                        **FINDINGS OF FACT AND**
                                                       **CONCLUSIONS OF LAW**
14

15   CITY OF SAN CLEMENTE, et al.,

16                Respondents and Defendants.

17

18

19   I.    **INTRODUCTION**

20          This case arises out of the City of San Clemente's adoption of an ordinance in 2015

21   that down-zoned a 6.63 acre parcel owned by Petitioners and Plaintiffs Saddleback

22   Memorial Medical Center and its parent company, Memorial Health Services (collectively,

23   "MemorialCare" or "Petitioners"). The new zoning limited the parcel's use solely to

24   operation of a general acute care hospital and provision of accessory medical services.

25          As a result, on April 8, 2016, MemorialCare filed a Petition and Complaint

26   ("Complaint") (Dkt. 29) against the City of San Clemente and the five members of its City

27   Council (the "City" or "Respondents") in the Superior Court of California, County of

28

Orange. On May 6, 2016, the City removed the action to this Court. Notice of Removal (Dkt. 1). On May 13, 2016, Petitioners filed a First Amended Complaint ("FAC") (Dkt. 12), bringing claims for a writ of mandate, inverse condemnation, and civil rights violations under state and federal law. Pursuant to Stipulation (Dkt. 23), the parties agreed to bifurcate trial of Petitioners' first claim for relief, which seeks the issuance of a writ of mandate under California Code of Civil Procedure §§ 1085 and/or 1094.5 to invalidate certain actions of the City described below.[1] Petitioners filed their opening trial brief (Dkt. 29) on June 30, 2017, and Respondents filed their opposition brief (Dkt. 32) on August 15, 2017. A joint Administrative Record ("AR," for citations below) was also submitted on August 15, 2017 (Dkts. 31, 34).[2] Petitioners filed their reply brief (Dkt. 35) on August 29, 2017.

---

[1] The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over this bifurcated claim, which is governed by California law. Because this action was filed within ninety days after the City adopted its Resolution approving General Plan Amendment No. 15-427, Zoning Amendment 15-428, and Specific Plan Amendments 15-449 through 15-452 (collectively, the "Zoning Changes"), this action was timely under California law pursuant to California Government Code § 65009.

[2] Defendants filed an Objection to evidence relied upon in Petitioners' opening brief, and asked the Court to strike or disregard such evidence (Dkt. 33). Specifically, Defendants argue that certain declaration and deposition testimony, as well as certain documents in the Joint Administrative Record, should be excluded because they were not part of the record before the City Council when the challenged decision was made. Plaintiffs respond that federal courts have allowed admission of extra-record evidence for limited purposes such as for providing background information and for ascertaining whether the decision-maker considered all the relevant factors (Dkt. 37). To the extent that the Court cites or relies on evidence to which the parties have objected, the Court has considered and overruled those objections. In particular, the Court agrees with Petitioners that some evidence at issue provides useful background information, although such information is in any case not central to the Court's decision in this case. *See Asarco, Inc. v. U.S. Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980); *see also Western States Petroleum Ass'n v. Super. Ct.*, 9 Cal. 4th 559, 578–79 (1995) ("[W]e do not foreclose the possibility that extra-record evidence may be admissible in traditional mandamus actions challenging quasi-legislative administrative decisions under unusual circumstances or for very limited purposes not presented in the case now before us. Indeed, as we noted earlier, the federal courts have allowed admission of extra-record evidence under certain circumstances."). As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

On September 21, 2017, and February 15, 2018, the Court conducted hearings that constituted trial of Petitioners' first claim for relief. Having considered all the evidence presented by the parties and the written submissions from both sides, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

## II.　FINDINGS OF FACT

1. Petitioner Memorial Health Services ("MHS") is a California nonprofit public benefit corporation; Petitioner Saddleback Memorial Medical Center ("SMMC") is also a California nonprofit public benefit corporation.

2. Respondent City of San Clemente is a municipal corporation, and the individual Respondents were members of San Clemente's City Council at the time of filing.

### A. The Hospital and the Property

3. Within the City of San Clemente lies a 6.63-acre parcel of property with a street address of 654 Camino de Los Mares (the "Property"). *See* AR 1243, 1796, 2709. A hospital with a functioning emergency room (the "Hospital") was constructed on the Property in 1971. *See* AR 389, 2710–13. The Property is located is within the northernmost portion of the City and adjacent to Interstate 5, near the Camino de Estrella exit. *See* AR 1519, 1713–14.

4. Since opening, the Hospital has had seven owners and many more operators, including some of the largest healthcare companies in the nation: American Healthcare Management, Samaritan Health Systems, Columbia/HCA Corp., and even two different physician-owned groups. *See generally* AR 2710–3385. The Hospital has been sold six times, twice out of bankruptcy.

5. To induce MemorialCare to acquire the Hospital, City staff or representatives may

have assured MemorialCare that if MemorialCare ultimately found that the Hospital was not viable, the City would work with MemorialCare to enhance the zoning of the Property. The City's Planning Department suggested to MemorialCare's representatives that if it appeared that the Hospital would have to close—an undesired outcome—the City would consider the site for a zone change that would allow for full commercial uses, and advised MemorialCare of the likely costs of such a zone change. AR 1239 ("Our interview with the San Clemente Planning Department indicates that the City desires the property to continue its use as a hospital facility, as there are no other hospitals in San Clemente. Planning Department officials indicated that, in the event of the possibility of the closure of the hospital, the site would be considered for a General Plan amendment, which would allow a change of zoning to Community Commercial (CC 2)."); *see also* AR 1259.

6.  In February of 2005, SMMC acquired the Property and Hospital. *See* AR 1713. The Hospital was an acute-care hospital with 73 beds (66 acute care medical-surgical beds and 7 intensive care beds), and had an attached emergency department with 10 treatment beds. *See, e.g.*, AR 1595, 1604.

7.   At the time SMMC acquired the Property, and continuing until the zoning enactments at issue, the Property was zoned "Regional Commercial (RC2)." AR 1239, 1258.

8.  The RC2 zoning classification allowed SMMC to operate a hospital on the Property. AR 357 ("The RC 2 zone provides for the continued use and development of the existing hospital facilities at 654 Camino de Los Mares."). However, the RC2 zone did not *require* that a hospital or emergency department be maintained on the Property, and the zone also allowed a range of other related uses, including medical offices, a congregate care facility, a convalescent home, accessory buildings, laboratories, and incidental uses. AR 358–65, 1258.

9.  With the exception of a small adjacent parcel that had been severed from the Property

for a convalescent care home, all surrounding properties along Camino de Los Mares were zoned Community Commercial 2 ("CC2") at all relevant times, which allowed for a variety of retail, office and medical-related uses. *See* AR 118, 357–65, 1258. Pursuant to the Zoning Changes referenced below, the CC2 category was slightly altered, and after January 2016 was technically classified as CC4. *See* AR 974–75.

10. SMMC operated the Hospital on the Property from the time of its acquisition in February 2005 until May 31, 2016, when Petitioners closed the Hospital. *See* AR 1594, 1713; Declaration of Stephen Geidt (Dkt. 29-4) ("Geidt Decl.") ¶ 3. While operated by MemorialCare, the Hospital was known as "Saddleback Memorial Medical Center – San Clemente."

11. At all times until May 31, 2016, the Hospital was a fully licensed acute care hospital with a functioning emergency room. *See* AR 1604. Until Petitioners closed the Hospital, it provided treatment and emergency services for the residents of the City and the south Orange County region. *See* AR 1050, 1603. According to a 2013 Community Health Needs Assessment, approximately 18% of Orange County residents seek treatment at an emergency room each year, with seniors visiting the emergency room at a rate of 22% per year. AR 1054, 1080. In 2015, the Hospital's emergency department was visited by 14,215 patients. AR 1604.

12. Until its closure, the Hospital was the only acute care hospital with an emergency room between Mission Viejo and Oceanside, a distance of approximately forty miles over roads that are often congested. AR 1603, 1628, 4099, 4280.

13. However, due to strict rules of the California Department of Public Health and Orange County Emergency Medical Services that regulate the type of patients that may be transported by ambulance to the various emergency departments in Orange County, the Hospital was not designated to receive patients needing care for certain serious injuries or conditions. AR 1595. For example, the Hospital was not licensed for obstetric services, so ambulances could not transport women in labor to the

Hospital. AR 1595, 1597. In addition, the Hospital was not designated as a stroke-neurology center, and thus a patient suffering a stroke or severe neurological problem, or needing neurological surgery, could not be transported to the Hospital. AR 1595, 1597. The Hospital also was not designated as a cardiac receiving center, so patients suffering a heart attack or cardiological trauma could not be transported to the Hospital by ambulance. AR 1595, 1597. And because the Hospital was not a designated trauma center, paramedics could not transport a patient or victim suffering major traumas, such as gunshot wounds or severe burns, to the Hospital. AR 1595, 1597. As a result, as many as 65% of medical 9-1-1 calls would bypass the Hospital and route patients to other hospitals with cardiac receiving centers, stroke receiving centers, and trauma centers. *See* AR 1603, 1722.

14. Petitioners remain the owners of the Property. *See* AR 1713.

**B. The City's Centennial General Plan Developed from 2009 to 2014**

15. In December 2009, the City began the process of completely revising the city-wide general land use plan. AR 111. Having last revised the general plan in 1993, the City studied land use patterns within its jurisdiction and gave the program the name "Centennial General Plan." AR 111.

16. The City's process in developing the Centennial General Plan was exhaustive: it appointed a General Plan Advisory Committee (the "Committee") made up of twenty-five community members representing various interests. AR 111. The members of the Committee were drawn from residents, business owners, and other stakeholders and discussed at length density, traffic, and other factors relevant to land use. AR 111. The Committee guided City staff and consultants in developing the plan, including by identifying the community's "core values" and the City's "key policy issue priorities," upon which the plan would be based. AR 111.

17. Even beyond the Committee's own work, the City conducted eighty-six public workshops and meetings, and the Planning Commission held forty public meetings to

consider the Committee's recommendations. AR 111.

18. After much public review and comment, the City Council adopted the Centennial General Plan on February 4, 2014. AR 100, 382.

19. The Centennial General Plan identified eight "focus areas" within the City, one of which was the area along Camino de Los Mares where the Property is situated (the "CDLM Focus Area"). AR 134, 164. The Centennial General Plan describes the CDLM Focus Area as a "primary community commercial" area that is "also a medical office hub." AR 135. It explains that, "[w]hile the area will continue to provide retail and commercial services for residents, the area is also envisioned to provide expanded opportunities for medical offices and services that respond to changing patient needs and demands, and to a rapidly changing health care industry." AR 135. The Centennial General Plan's stated goal for the CDLM Focus Area is: "Maintain and improve the Area as a community hub that provides diverse retail opportunities and commercial services for local residents and high quality medical services and related employment opportunities for San Clemente and surrounding communities." AR 135.

20. The Centennial General Plan's Land Use Policy - 7.02 ("LU-7.02") states that the City's land regulation policies should aim to "support the expansion of health care facilities and related offices . . . ." AR 135. In LU-7.03, the City pledged to "collaborate with local health care providers and facilities to understand their changing requirements and help meet the needs of our residents." AR 135–36.

21. The City planned to implement these Land Use Policies for the Camino de Los Mares areas by "[m]eet[ing] with medical office professionals and hospital administration to better understand their needs and use of City resources and to help them better accomplish their goals and objectives." AR 152.

22. The Centennial General Plan made no land use, topographical, or other distinction between the Property and the surrounding medical office properties located along

Camino de Los Mares; all of the properties along Camino de Los Mares—including the Property—were designated CC2 under the Centennial General Plan. AR 135–36, 155.

23. The Centennial General Plan's CC2 land use designation allowed the widest range of commercial, retail, and medical uses, including, in addition to hospital uses, medical and professional offices, senior housing, drugstores, and virtually every sort of retail operation, from sales of bicycles and clothing to office equipment, and beyond. AR 358–65.

24. Within the CC2 zone, a "hospital use" was afforded certain rights not available to other property uses within the zone. For example, while properties in the CC2 zone were limited to a 0.75 Floor Area Ratio ("FAR") (ratio of building's total floor area to the area of the parcel on which the buildings sits), the Centennial General Plan allowed hospital uses a FAR of 2.0, more than twice as intense a use as surrounding properties. AR 118. The CC2 zone also allowed hospitals to build to a maximum height and maximum number of floors greater than any other use. AR 118. The CC2 zone identified in the Centennial General Plan also allowed significantly greater lot coverage for the hospital use than for any other use. AR 368.

25. Throughout the Centennial Plan, the City referenced the hospital and sought to ensure that the City's land use policies were compatible with, and supported, the hospital's operations. *See* AR 98–370. For example, portions of the Centennial General Plan contemplated measures to reduce noise and freight traffic near sensitive areas such as the Hospital, in order to protect human health and ensure the Hospital's quality of care. AR 218, 282. The transportation component of the Centennial Plan was designed with a goal of managing the public transportation system to ensure adequate emergency response times. AR 216. The Centennial General Plan also discussed the importance of protecting the Hospital, noting that the City would take steps to ensure that "critical public facilities, such as schools, hospitals, and

8

1  emergency services, are seismically strengthened . . . ." AR 290.

2  26.  The Centennial General Plan specifically calls out "hospitals" as a Public and

3       Institutional Land Use, which is a category of land use that "serve[s] the public" and

4       "help[s] meet the broader community's needs." AR 133. In the "Implementation

5       Measures" portion of the plan, the City committed itself to collaboration "with local

6       hospitals and health service providers" to "support measures that improve the

7       availability of and access to primary care and other phsyicians' services and

8       emergency care facilities in San Clemente . . . ." AR 240.

9  27.  The Centennial General Plan includes a "Critical Facilities" map, and the Hospital is

10      the only health care facility identified on the map. AR 296.

11      **C.  The Centennial General Plan's Implementing Amendments in 2015**

12  28.  On August 19, 2014, the City hired an outside expert, Mr. James Hare, to "prepare

13      amendments to the City's Zoning Ordinance to bring the ordinance into conformity

14      with the new [Centennial General Plan]." AR 463.

15  29.  On April 22, 2015, a series of zoning amendments were considered and approved for

16      inclusion as part of Zoning Amendment 14-456. Those amendments included the

17      formality of changing the zoning designation of the Property from "Regional

18      Commercial (RC2) to Community Commercial 2 (CC2)" in conformity with the

19      Centennial General Plan. AR 463, 1427.

20  30.  As a result of the Centennial General Plan planning process, which took place from

21      2009 to 2015, the City concluded that the Property should be zoned identically to all

22      of the surrounding properties, allowing it to also be used for virtually any medical,

23      commercial, or retail use. *See* AR 463, 662–71.

24      **D.  Healthcare Developments Lead Hospital to Announce Potential Closure**

25  31.  Over the last decade or so, healthcare throughout the nation has undergone dramatic

26      changes. *See* AR 18–20, 38–44, 1721–23. The number of patients admitted to

27      hospitals has dramatically declined, due to such factors as (a) increasing costs; (b)

28

9

advances in medical technology that allow many procedures such as x-rays and other imaging, dialysis treatments, and, increasingly, surgeries, to be performed in less-expensive outpatient facilities; (c) health insurance company and Medicare policies discouraging hospital admissions and limiting hospital stays; (d) the Value Based Purchasing elements of the Affordable Care Act that reduced hospital admissions; and (e) growing competition from healthcare maintenance organizations such as Kaiser Permanente. For example, from 2011 to 2015, inpatient admissions at Mission Hospital, Hoag Hospital, and Saddleback Memorial Medical Center declined on average by 15%, amounting to 10,000 fewer patients in those three hospitals alone. *See* AR 18–20, 38–44, 1721.

32. These trends had an impact on many hospitals, particularly smaller facilities such as the Hospital. *See* AR 10, 20–21. Beginning in 2010, the inpatient census at the Hospital began to decline. *See* AR 1719, 1728. By 2012, the daily average number of inpatients at the Hospital fell to 23. AR 1719. By 2014, the daily average number was 16.6. AR 1719. By the end of 2016, the daily average fell further to 10. AR 1719; *see also* AR 10. In one month in 2015, there were 3 days with only 5 inpatients at the Hospital. AR 1729; *see also* AR 44.

33. The Hospital also suffered economically. From 2007 through 2012, it essentially broke even; its net income averaged $100,000 per year during that time. *See* AR 1720. By 2013, the Hospital suffered a loss of $1,127,000 and lost still more money every year until, in 2016, it lost in excess of $3,300,000. AR 1720.

34. When facilities such as the Hospital have an extremely low patient count, their ability to deliver safe, skilled healthcare is at risk. *See* AR 36–37. Doctors can be reluctant to admit patients due to a lack of resources; staff, such as qualified nurses, may seek other employment opportunities. *See* AR 1721 (explaining to the City Council that, "[A]s hospital volumes shrink, we have a harder and harder time keeping specialists available at the hospital, in areas like urology, neurology, gynecology, and infectious

disease, because we don't have enough patients for it [to] be efficient for them to be on staff.").

35.     In early 2016, MemorialCare was concerned that the low inpatient count would begin to threaten patient safety. *See* AR 1587 ("[T]he forces that have driven the volumes at San Clemente to their current levels are relentless and have, over the last few years, become somewhat self-fulfilling; i.e. the smaller and less relevant the campus becomes, the less physicians and consumers want to be associated with it, driving volumes down further, faster. It has reached levels that are not only functionally unsustainable, but arguably unsafe . . . and by unsafe, I am suggesting that it is incapable of meeting the community standard of acute care as a result of having fewer available resources, specialization and capabilities as those found in adjacent community hospitals."). This concern was stated by several speakers at the City Council's hearing on the Zoning Changes. *See* AR 10, 36–38.

36.     Likely in recognition of these downward trends and the changes in the healthcare industry, in 2014 MemorialCare began formulating a plan for closing the Hospital and constructing in its place a new state-of-the-art outpatient medical facility with an advanced 24-hour-a-day urgent care center, a women's health center, a surgery center, rehabilitation facilities, physicians' offices, an ultrasound, CAT scan, MRI, and imaging center, a lab, and other cutting-edge healthcare services (the "Outpatient and Advanced Urgent Care Complex"). *See* AR 12, 14, 1744–45.

37.     In mid-2014, MemorialCare advised the City of its plans to close the Hospital and construct the new facility. *See* AR 393– 97. MemorialCare engaged a national firm, NexCore Group, to undertake a detailed study of the community needs and the receptivity of the area's medical community to the proposed Outpatient and Advanced Urgent Care Complex. AR 1281–1419.

38.     NexCore conducted over 100 meetings in the community and worked with MemorialCare to survey medical groups representing 108 physicians. AR 1285,

1288, 1314. NexCore found that the local physicians almost unanimously supported the Outpatient and Advanced Urgent Care Complex. AR 1318–35.

39. When the City learned of the potential Hospital closure, it took immediate steps to understand the impacts, seek community input, involve stakeholders, and consider plans to mitigate the potential impact to the City. *See* AR 1, 855.

40. More than 11,000 City residents signed a petition urging the retention of the Hospital with emergency room services. AR 48.

41. After the announcement of the potential closure, the City proactively sought to involve other healthcare providers who may wish to purchase the Property from Petitioners and continue to operate the Hospital. *See* AR 1–2.

42. On December 2, 2014, the City Council held a duly noticed public meeting at which the potential closure of the Hospital was discussed. The City Council heard testimony from doctors and community members, including testimony that there was in fact demand for the Hospital, and that if the Hospital closed, hospital transportation times would increase. AR 1971–72.

43. At the conclusion of the meeting, the City Council adopted a resolution opposing the closure, making the following finding, among others: "[C]ommunity members have voiced their concerns about the potential loss of the acute care hospital and emergency services and fear for the health and welfare of the residents and visitors who are in critical need to be transported at minimum an additional 9 miles from the current emergency room to the nearest hospital." *See* AR 1972.

44. A small group of doctors, two of whom had belonged to the physician/owner group that sold the facility to MemorialCare (Drs. Gus Gialamas and Steven Cullen), opposed the closure of the Hospital and the establishment of the Outpatient and Advanced Urgent Care Complex. By the latter half of 2014, the two doctors assisted in mounting a public relations campaign opposing closure. *See* AR 1129. Dr. Cullen wrote by email to Councilman Baker (who forwarded the email to Councilman

Hamm) in December 2014 that "I still think public sentiment remains our biggest weapon. With that in mind our PR campaign continues . . . ." AR 1129.

45.   In that same December 2014 email, Dr. Cullen urged Councilman Hamm to have the City resort to its zoning powers in the hope of intimidating MemorialCare into changing its plan to close. AR 01129.

46.   The Orange County Fire Authority ("OCFA") studied the issue of the Hospital closure, and created a report analyzing the effects of a potential closure. AR 4087–4105. In a February 10, 2015 memorandum, OCFA concluded that closure of the hospital would negatively impact their ability to provide emergency services to south Orange County residents, and that the closure would have a negative impact on other hospitals because of increased patient intake. AR 4088 ("Current and projected experience data indicate that the hospital closure would pose impacts to OCFA's delivery of emergency services and increase impacts to other hospitals within Orange County."); AR 4093 ("The loss of San Clemente Hospital and emergency room would likely impact OCFA, increasing unit response and transport times, decreasing unit availability, increasing turnaround times, and would require additional resources to maintain existing levels of response capability.").

47.   On February 12, 2015, OCFA issued an Incident Response/Bypass/Diversions Report, wherein it determined that seventy-two percent of patients transported by OCFA from the City in 2014 were transported to the Hospital, and that the average transport times to the next closest hospital in Mission Viejo were nearly double the transport times to the Hospital in the City (16.15 minutes compared to 8.5 minutes). AR 4107. Also, Mission Viejo is occasionally on diversion (i.e. it will not accept additional emergency drop-offs), which necessitates transport to even more distant hospitals. *See* AR 48, 1972, 4280. The transport times to Mission Hospital Laguna Beach and Saddleback Memorial Care Laguna Hills were even longer (20.1 minutes and 22.9 minutes on average, respectively). AR 4107.

48. Based on this data and other information presented to the City Council, the City reasonably determined that the closure of the Hospital would have a significant adverse effect on the health, safety, and welfare of the residents of San Clemente and the broader South Orange County region.

**E. The City and MemorialCare Together Seek a Legislative Solution**

49. The City's major concern was the closing of the Hospital's Emergency Department. California law requires that emergency departments operate as a component of a fully-licensed acute care hospital, and prohibits the operation of a free-standing emergency department. *See* AR 2, 4280. Accordingly, the City and MemorialCare agreed, in early February 2015, that MemorialCare would defer closure of the Hospital for eighteen months to work diligently with the City to seek a legislative exception that would allow MemorialCare to operate a free-standing emergency department as part of the Outpatient and Advanced Urgent Care Complex (in essence, allowing the Hospital to close while its Emergency Department remained open). *See* AR 2, 1132. The Saddleback Memorial San Clemente Hospital Advisory Committee worked to draft California Assembly Bill 911 (Brough) and Senate Bill 787 (Bates), which would authorize a freestanding "satellite" emergency department. AR 2. The City and MemorialCare both engaged lobbyists and tried to secure passage of the exemption. AR 2, 1131.

50. By late summer 2015, the two bills introduced for the exception died in the Health Committees of the California Assembly and Senate, and thus both failed to become law. *See* AR 1583.

**F. The City Rezones the Hospital Property**

51. On October 21, 2015, and again at the City Council meeting of November 3, 2015, the City Council issued a directive to the City's staff to re-zone the Property so that the Property could only be used for an acute-care hospital and emergency department. AR 1, 972–73, 2236.

52. In response to the directive, City staff prepared a Staff Report for the San Clemente Planning Commission that explained proposed zoning amendments, analyzed whether the amendments were consistent with the Centennial General Plan, and recommended that the amendments be approved. AR 972–79.

53. The proposed amendments created an entirely new zoning designation named "Regional Medical Facilities 1" ("RMF1"), and applied it to the Property, and only the Property. AR 979. It also slightly altered the zoning of surrounding properties from CC2 to CC4, which still allowed for a wide range of uses while also adding "group counseling" uses as conditionally permitted. *See* AR 974 ("The new CC 4 zone permits the same uses allowed in the CC 2 zone, with the exception of additional hospital-supporting and medical office-related uses.").

54. The RMF1 category precluded any use of the Property unless the owner operates a fully-licensed hospital and emergency room on the Property. *See* AR 973–74. However, the RMF1 zoning designation also allowed a range of ancillary uses such as medical offices and group counseling facilities.

55. The proposed amendments also precluded hospital uses in other parts of the City, to ensure that the Hospital would not face a competitor in the City that could threaten the Hospital's viability. AR 974, 1839.

56. Mr. Atamian, an Associate Planner for the City, designed the proposed zoning amendments, prepared the Staff Report, and composed the various findings contained in that Report. AR 972; Deposition of Adam Atamian ("Atamian Depo") (Dkt. 38-1) at 161:13–24, 184:2–190:18.

57. Neither Mr. Atamian nor any City staff member conducted any studies, investigations, or research regarding the proposed Outpatient and Advanced Urgent Care Complex or its potential benefits. *See generally* AR. Neither Mr. Atamian nor any City staff member conducted any comparative research, study, or evaluation to assess whether the Outpatient and Advanced Urgent Care Complex proposed by

MemorialCare would be more—or less—beneficial to the community than the Hospital. Atamian Depo at 129:25–132:5, 136:4–18, 159:4–160:22.

58. Neither Mr. Atamian nor any other City staff member specifically studied the ongoing feasibility of a hospital; Mr. Atamian simply proposed zoning amendments aimed at "encouraging" a hospital use on the Property, but he did not know or study whether the proposed amendments could or would achieve the goal of maintaining hospital operations on the Property. *See* AR 972–79; Atamian Depo at 131:9–135:2, 136:4–18, 159:4–160:22, 174:3–177:7, 188:9–189:9.

59. Mr. Atamian did not balance the competing interests of affected parties, or assess the burden on MemorialCare or the community; he simply followed the directive he had been given: to create a zoning amendment designed to maintain a hospital use on the Property. *See* AR 1 ("At the November 3, 2015 City Council meeting, the Council directed staff to prepare a rezone and General Plan amendment to ensure that the current hospital property is zoned only for the essential hospital purpose it was designated for when purchased by Saddleback Memorial Care in 2007."); Atamian Depo at 159:23–160:9.

60. At their December 16, 2015 meeting, the San Clemente Planning Commission considered the Staff Report and the proposed zoning amendments. *See* AR 972, 1797, 2280–82. At that Planning Commission meeting, Mr. Atamian explained that the purpose of the downzoning was to "encourage the maintenance of the current hospital site." AR 81, 973.

61. MemorialCare had advised the City that it intended to close the Hospital and pursue the construction of the Outpatient and Advanced Urgent Care Complex. *See* AR 76, 95, 394, 398; Atamian Depo at 107:2-111:5, 167:22–168:1.

62. The City recognized that the proposed zoning amendments gave MemorialCare, as the Property's owner, one of two choices—continuing to operate the Hospital or having no use of the Property at all. AR 84; *see also* Atamian Depo at 167:16–168:6.

63. The Planning Commission was also informed that another purpose of the proposed zoning amendments was to create a monopoly on hospital use for whoever owned the Property. AR 97; *see also* Atamian Depo at 190:24–191:22. Mr. Atamian told the Planning Commission, "You know, right now hospitals are allowed in a couple different zones and as property owners it's nice to know that now the only place that's [an] allowed [use] is the zone that you're in. There's no competition. Somebody would have to go through a very large entitlement process unless the city identified another RMF zone. You know this is, this basically cuts out a lot of competition for future hospitals and that's an incentive you know to make this site as the hospital." AR 87.

64. After considering and discussing the proposed zoning amendments, the Planning Commission passed and adopted a resolution recommending that the City Council approve the proposed zoning amendments. AR 1796–1803.

65. On January 19, 2016, the City Council held a noticed public hearing to address the proposed zoning amendments. *See* AR 2290–94. Leading up to the meeting, the City Council received many written comments from the San Clemente community regarding the proposed zoning amendments, including both letters favoring and letters opposing the amendments for various reasons. *See* AR 4302–4782.

66. At the meeting, the City Council heard and considered a significant amount of testimony and data. *See* AR 4–80, 2290–93.

67. The City Council considered public comments that the proposed amendments would deny MemorialCare the flexibility needed to respond to healthcare trends and provide the best care to the City's residents. *See, e.g.*, AR 16–17.

68. The City Council considered testimony about the benefits of the proposed Outpatient and Advanced Urgent Care Complex. *See, e.g.*, AR 36–37.

69. The City Council considered the fact that the Hospital received approximately 15,000 annual emergency room visits. AR 71.

70. The City Council considered that even after adoption of the proposed zoning amendments, Petitioners would be permitted to construct and operate their proposed Outpatient Complex provided they also operated a functioning hospital serving the emergency medical needs of the residents of the City and the broader south Orange County region. AR 72.

71. The City Council considered the long history of the Property being used for a hospital, and the importance of a functioning emergency department to the health, safety, and welfare of the residents of San Clemente and the broader south Orange County region. AR 72–76.

72. The City Council considered testimony, both oral and previously mailed letters and emails, from residents of San Clemente on the importance of keeping a functioning emergency department in San Clemente. *See* AR 72–76.

73. The City Council also considered previously provided data, such as the reports prepared by OCFA that described the potential adverse effects the hospital closure could have on the health, safety, and welfare of residents of the City and the broader south Orange County region, including the adverse effect on neighboring hospitals that would face increased patient intake. *See* AR 4087–4105.

74. The City Council also considered evidence before it that the closure of the Hospital would have an adverse effect upon the public health, safety, and welfare of South Orange County as a whole. This evidence included a study entitled "California Emergency Department Closures are Associated with Increased Inpatient Mortality at Nearby Hospitals" that concluded that Emergency Department closures increase mortality in surrounding hospitals and communities. *See* AR 3947–54.

75. The City Council considered that the Hospital Property is an ideally situated location for a hospital because it is already in a medical focus area with established medical facilities, and it is a large site allowing for growth. The site is also adjacent to a freeway off-ramp, is near a fire station, serves as an anchor for the local medical

18

focus area, and has been successfully used as a hospital for decades. *See* AR 85, 974.

76. At the January 19, 2016 meeting, the City Council engaged in a discussion with Petitioners' legal and administrative representatives, during which Petitioners' representatives commented that adopting the proposed zoning amendments would "leave the San Clemente [Hospital] campus with almost no choice but to close, robbing the San Clemente residents of local options for healthcare." AR 10; *see also* AR 11. In contrast, rejecting the proposed amendments would give MemorialCare "options for providing viable care." AR 10, 12; *see also* AR 54 ("[T]his zoning change will not in any way stop the potential closure of this hospital. The only thing it will accomplish is to tie our hands and limit the number of options available to provide medical services to the residents of South County. . . . It's an acute-care hospital or basically it's nothing."). However, a MemorialCare representative acknowledged that no concrete decision to close the Hospital had yet officially been made, and that "incentives" existed that "can change the market forces that are out there." AR 53–54. None of the MemorialCare representatives that spoke indicated that MemorialCare was unwilling to sell the Property to another entity willing to operate a hospital at the Property. *See* AR 9–67. On the other hand, there is no evidence in the record indicating that there was any entity that was prepared to buy the Property and operate the Hospital.

77. Based on these representations, the City Council may have believed that it could take action to prevent the closure of the Hospital or at least ensure that some entity would continue to operate a hospital at the Property, even if Petitioners would not continue to operate the Hospital.

78. Based on the data that demonstrated the importance of a functioning hospital with an emergency room to the health, safety, and well-being of residents of the City and the broader south Orange County region, and based on their belief that the closure of the Hospital could potentially be avoided, the City Council of San Clemente approved

the adoption of the proposed zoning amendments at the January 19, 2016 meeting. AR 1824–28, 2294.

79. The zoning amendments became effective as Ordinance 1616 as of the February 2, 2016 City Council meeting, upon the second reading of the Ordinance. AR 1821–35, 2321.

### G. The Hospital Closes

80. After passage of Ordinance 1616, and despite the City's efforts, Petitioners made the decision to close the Hospital, and on May 31, 2016, Petitioners closed the San Clemente Memorial Hospital.

81. On May 2, 2016, MemorialCare received a letter from the California Department of Public Health indicating that it had complied with the law applicable to the closing. *See* Administrative Record Augmentation Request, Exhibit 1 (Dkt. 36-1) at 4906.

82. Since May 31, 2016, the more than 135,000 residents of San Clemente and the surrounding area have been without immediate access to critical emergency medical care. The entire Hospital Property is now surrounded by a security fence, unused for any purpose. The citizens of San Clemente are not being served.

### III. CONCLUSIONS OF LAW

83. MemorialCare challenges the Zoning Changes enacted by Ordinance 1616 and seeks the issuance of a writ of mandate from this Court ordering that the Zoning Changes be invalidated and set aside on three separate and independent grounds under California law. Specifically, MemorialCare argues that the Zoning Changes constitute an illegal and improper use of the City's zoning powers because: (1) they effect impermissible spot zoning, (2) they eliminate virtually all feasible use of the Property, and (3) they create an impermissible monopoly. The Court will address each of these three issues in turn after discussing the legal standards that apply to this

1     request for a writ of mandate.

2 84.   Because this petition for a writ of mandate arises under state law, California

3     substantive law governs the adjudication of this claim. *See* FAC ¶¶ 55–59 (seeking a

4     writ of mandate under California Code of Civil Procedure §§ 1085 or 1094.5).

5 85.   Under California law, quasi-judicial administrative decisions are subject to

6     administrative mandamus pursuant to California Code of Civil Procedure § 1094.5,

7     while legislative acts are subject to review under ordinary mandamus pursuant to

8     California Code of Civil Procedure § 1085. *See* Cal. Code Civ. Proc. §§ 1084,

9     1094.5; *Consaul v. City of San Diego*, 6 Cal. App. 4th 1781, 1792 (1992) ("[Q]uasi-

10     judicial administrative decisions are reviewed at the trial level by proceedings in

11     administrative mandamus under section 1094.5."); *Arnel Dev. Co. v. City of Costa*

12     *Mesa* ("*Arnel I*"), 28 Cal. 3d 511, 521 (1980) (explaining that legislative acts are

13     reviewable by ordinary mandamus).

14 86.   "California precedent has settled the principle that zoning ordinances, whatever the

15     size of parcel affected, are legislative acts." *Arnel I*, 28 Cal. 3d at 514. As a result,

16     "[a] zoning ordinance is reviewable by ordinary mandamus (Code Civ. Proc., §

17     1084)." *Id.* at 521; *see also Ensign Bickford Realty Corp. v. City Council*, 68 Cal.

18     App. 3d 467, 473 (1977) ("The zoning of real property by a city . . . is a legislative

19     function, not a quasi-judicial activity, and is therefore reviewable by ordinary, or so-

20     called traditional, mandamus pursuant to Code of Civil Procedure section 1085.").

21 87.   Because the City's enactment of Ordinance 1616 was a legislative zoning decision

22     rather than a quasi-adjudicatory act, that decision is subject to review only under the

23     ordinary writ of mandamus standard; the standard of review for administrative

24     mandamus actions is inapplicable in the present action. *See Foothill Cmtys. Coal. v.*

25     *Cty. of Orange*, 222 Cal. App. 4th 1302, 1309 (2014); *Arnel I*, 28 Cal. 3d at 521.

26 88.   In an ordinary mandamus proceeding, "[t]he standard for review of a quasi-

27     legislative act is whether the action was arbitrary or capricious or totally lacking in

28

evidentiary support, or whether the agency has failed to follow the procedure and give the notices required by law." *City of Carmel-By-The-Sea v. Bd. of Supervisors*, 183 Cal. App. 3d 229, 238–39 (1986) (citation omitted). Under this deferential standard, courts determine whether the legislative action taken was "reasonably related to the public welfare." *Consaul*, 6 Cal. App. 4th at 1791–92; *see Arcadia Dev. Co. v. City of Morgan Hill*, 197 Cal. App. 4th 1526, 1536 (2011) ("City's exercise of its constitutionally derived police power is subject to substantial deference from the judicial branch. A land use ordinance is a valid exercise of the police power if it bears a substantial and reasonable relationship to the public welfare." (citations omitted)). Thus, a challenged zoning ordinance can be invalidated by a court "only if it is arbitrary, discriminatory, and bears no reasonable relationship to a legitimate public interest." *Arcadia Dev. Co.*, 197 Cal. App. 4th at 1536 (citation omitted); *see also Carrancho v. California Air Res. Bd.*, 111 Cal. App. 4th 1255, 1265 (2003) ("Mandamus may issue to correct the exercise of discretionary legislative power, but only if the action taken is so palpably unreasonable and arbitrary as to show an abuse of discretion as a matter of law. This is a highly deferential test.").

89. Finally, "[u]nless otherwise provided by law, 'the petitioner always bears the burden of proof in a mandate proceeding brought under Code of Civil Procedure section 1085.' Thus, it is [MemorialCare's] burden to establish that [the City's] decision was arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair." *Am. Coatings Assn. v. S. Coast Air Quality Mgmt. Dist.*, 54 Cal. 4th 446, 460 (2012) (citations omitted); *see also Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1309 ("The party challenging a zoning ordinance as arbitrary or capricious bears the burden of producing sufficient evidence from which the trier of fact may conclude that the ordinance is unreasonable and invalid." (citations omitted)); *Cty. of Del Norte v. City of Crescent City*, 71 Cal. App. 4th 965, 973 (1999) ("Legislative enactments are presumed to be valid; to overcome this presumption the petitioner

1    must bring forth evidence compelling the conclusion that the ordinance is

2    unreasonable and invalid." (citation omitted)).

3    **A. Spot Zoning**

4    90.   MemorialCare first argues that enactment of the Zoning Changes was an invalid

5          exercise of the City's police power because it amounted to illegal spot zoning;

6          according to MemorialCare, the City acted in an impermissibly arbitrary and

7          discriminatory fashion by singling out the Property as the only parcel in the City to

8          be burdened by a hospital use requirement, thereby denying the public the benefits of

9          the proposed Outpatient and Advanced Urgent Care Complex.

10   91.   Under California law, a city "spot zones" when it enacts a zoning ordinance that

11         targets for disparate treatment one property in the midst of similar properties. *See,*

12         *e.g.*, *Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1311 ("Spot zoning occurs where a

13         small parcel is restricted and given lesser rights than the surrounding property, as

14         where a lot in the center of a business or commercial district is limited to uses for

15         residential purposes thereby creating an 'island' in the middle of a larger area

16         devoted to other uses." (citation omitted)).

17   92.   However, spot zoning is not per se illegal—"[e]ven where a small island is created in

18         the midst of less restrictive zoning, the zoning may be upheld where rational reason

19         in the public benefit exists for such a classification." *Avenida San Juan P'ship v. City*

20         *of San Clemente*, 201 Cal. App. 4th 1256, 1269 (2011) (citation omitted); *see also*

21         *Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1314 ("[T]he term 'spot zoning' is

22         merely shorthand for a certain arrangement of physical facts. When those facts exist,

23         the zoning may or may not be warranted. . . . Spot zoning may well be in the public

24         interest; it may even be in accordance with the requirements of a master plan."

25         (citations omitted)).

26   93.   Thus, "to determine whether *impermissible* spot zoning has occurred, a court . . .

27         conduct[s] a two-part analysis." *Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1307. A

28

1    court first decides whether the challenged action constitutes spot zoning, and if the

2    court finds that spot zoning has occurred, "the court must determine whether the

3    record shows the spot zoning is in the public interest." *Id.*

4    94.    Because spot zoning implicates discriminatory treatment, in determining under the

5           second step of this analysis whether the spot zoning at issue is permissible, the Court

6           is not required simply to accept at face value the assertions of a municipality

7           declaring that it has acted in the public benefit. *See, e.g.*, *Arcadia Dev. Co.*, 197 Cal.

8           App. 4th at 1538 (analyzing whether ordinance was in fact substantially related to the

9           public welfare in the manner that the city claimed it was); *see also Ehrlich v. City of*

10          *Culver City*, 12 Cal. 4th 854, 900 (1996) (Mosk, J., concurring) ("When the zoning

11          ordinance appears to subject a property owner to a special restriction not applicable

12          to similarly situated adjacent property, courts will conduct a more searching inquiry

13          into the reasons and motives of the legislative body to determine if the zoning is

14          arbitrary and discriminatory."); *Kissinger v. City of Los Angeles*, 161 Cal. App. 2d

15          454, 462 (1958) ("[W]here . . . the facts are such as to show an attempt to exercise

16          the police power in such a manner as to oppress or discriminate against an individual

17          or individuals we are entitled to give weight to the evidence disclosing a purpose

18          other than that declared by the ordinance in determining its validity." (citations

19          omitted)).

20    95.    "There must be a reasonable basis in fact, not in fancy, to support the legislative

21          determination. Although in many cases it will be 'fairly debatable' that the ordinance

22          reasonably relates to the regional welfare, it cannot be assumed that a land use

23          ordinance can never be invalidated as an enactment in excess of the police power."

24          *Associated Home Builders etc., Inc. v. City of Livermore*, 18 Cal. 3d 582, 609 n.26

25          (1976) (citation omitted). While a court may "defer to the judgment of the

26          municipality's legislative body," it must keep in mind that "judicial deference is not

27          judicial abdication." *Arnel Development Co. v. City of Costa Mesa* ("*Arnel II*"), 126

28

                                                 24

1  Cal. App. 3d 330, 339 (1981).

2  96.  Nevertheless, "[i]n deciding whether a challenged ordinance reasonably relates to the

3  public welfare, the courts recognize that such ordinances are presumed to be

4  constitutional, and come before the court with every intendment in their favor."

5  *Associated Home Builders*, 18 Cal. 3d at 604–05 (citation omitted). "The wisdom of

6  the prohibitions and restrictions is a matter for legislative determination, and even

7  though a court may not agree with that determination, it will not substitute its

8  judgment for that of the zoning authorities if there is any reasonable justification for

9  their action." *Lockard v. City of Los Angeles*, 33 Cal. 2d 453, 461 (1949). In short,

10  "[i]f the validity . . . be fairly debatable, the legislative judgment must be allowed to

11  control." *Associated Home Builders*, 18 Cal. 3d at 605 (quoting *Vill. of Euclid, Ohio*

12  *v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926)).

### 1. The City Spot Zoned the Hospital Property

14  97.  The Property at issue is a 6.63-acre parcel that is small enough under California law

15  to be subject to spot zoning. *See Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1314

16  (finding that a parcel of 7.25 acres had been spot zoned).

17  98.  Ordinance 1616 spot zoned the Property because it targeted just one parcel in the

18  City—the Property owned by MemorialCare—for different zoning restrictions,

19  creating an "island" in a sea of parcels zoned under a community commercial

20  designation. Specifically, the Centennial General Plan established that all parcels

21  along the Camino de Las Mares corridor were to be zoned CC2 (Community

22  Commercial 2), which allows a wide range of commercial, medical, and healthcare

23  uses. The Zoning Changes, implemented approximately 18 months after the adoption

24  of the Centennial General Plan, changed the zoning category to be applied to the

25  Property to RMF1; it applied this zoning change to the Hospital Property, and to no

26  other parcel. The RMF1 category contains use limitations that are far more restrictive

27  than those applied to all surrounding properties: pursuant to the RMF1 category, the

28

owner of the Property must use the Property for a hospital and emergency department, or it may not use the Property at all. No other property in the City is subject to such a hospital use requirement.

99. In fact, the City conceded at oral argument that the Zoning Changes spot zoned the Property. *See* September 21, 2017 Trial Transcript (Dkt. 45) at 35:18–22 ("THE COURT: So was there spot zoning here? MR. DUNN [for the CITY]: Yes. Spot zoning occurs. In fact . . . spot zoning happens all the time. They—the issue really becomes: Is it illegal spot zoning[?]").

### 2. *The Spot Zoning Was Not Arbitrary, Capricious, Devoid of Evidentiary Support, or Unrelated to the Public Interest*

100. Having found that the Zoning Changes constitute spot zoning, the Court must determine whether that spot zoning is illegal by analyzing whether the Zoning Changes were supported by a "rational reason in the public benefit" and were not "arbitrary or capricious or totally lacking in evidentiary support." *Avenida San Juan*, 201 Cal. App. 4th at 1268–69; *see also Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1314 ("[T]he court must determine whether the record shows the spot zoning is in the public interest."); *Aracadia Dev. Co.*, 197 Cal. App. 4th at 1536–37 (explaining that the core issue in determining whether a zoning ordinance is a valid exercise of the police power is whether the ordinance bears a "reasonable relationship" to a legitimate public interest).

101. Here, the record contained evidence to support the City's determination that maintaining a hospital at the Property would be in the public interest. For example, the City considered: (1) the fact that the Hospital received about 15,000 annual emergency room visits, (2) a study demonstrating that emergency department closures increase patient mortality at nearby hospitals, and (3) the OCFA report indicating that the Hospital's closure would increase impacts to other hospitals within Orange County and would adversely impact OCFA's provision of emergency

26

services. In addition, the City considered written and oral testimony from residents of San Clemente about why maintaining a functioning emergency department was important to them and beneficial to the region's public welfare. Accordingly, the decision to enact Ordinance 1616 was not "totally lacking in evidentiary support." *See Avenida San Juan*, 201 Cal. App. 4th at 126. Rather, the Zoning Changes enacted to reserve the Property for a hospital use were supported by "rational reason[s] related to the public welfare," including minimizing transport times and mortality and avoiding impacts to other hospitals and to OCFA's ability to maintain its existing level of emergency services. *See Arcadia Dev. Co.*, 197 Cal. App. 4th at 1537; *see also Arnel I*, 28 Cal. 3d at 522 (explaining that a zoning ordinance "does not require explicit findings" and is "valid if it is reasonably related to the public welfare"; unlike administrative decisions, zoning ordinances are not required to "implement established standards and rest upon findings supported by substantial evidence" (citations omitted)).

102. Further supporting the conclusion that the Zoning Changes were reasonably related to the public welfare is the fact that the Zoning Changes were found to be consistent with the Centennial General Plan. *See* AR 972. "[A] city's general plan may be viewed in many ways as the city's articulated perceptions of what constitutes the locale's 'general welfare,'" and thus a zoning ordinance's consistency with a city's general plan may suggest that the ordinance is reasonably related to the public welfare. *See City of Del Mar v. City of San Diego*, 133 Cal. App. 3d 401, 414–15 (1982). Here, the Centennial General Plan specifically identified the Hospital as a "critical facility," and called out "hospitals" as a Public and Institutional Land Use, which is a category of land use that "serve[s] the public" and "help[s] meet the broader community's needs." AR 133, 296. Moreover, throughout the Centennial Plan, the City referenced the Hospital and sought to ensure that the City's land use policies were compatible with, and supported, the Hospital's operations. *See* AR 98–

370. Thus, the City's general plan reflects the notion that maintaining a hospital in the City advances the public welfare.

103. MemorialCare nevertheless argues that the Zoning Changes were not in the public interest because, had the changes not been enacted, MemorialCare would have been able to construct a state-of-the-art urgent care and medical office facility that would provide important health services to the public. In other words, MemorialCare claims that the Zoning Changes are against the public interest because they deny the benefits that the public would have enjoyed through operation of the proposed Outpatient and Advanced Urgent Care Complex. MemorialCare asserts that the City's determination that a hospital and emergency room are superior to an urgent care facility is false and invalid.

104. However, for the reasons discussed below, the fact that the Zoning Changes denied the public the potential benefits of the proposed Outpatient and Advanced Urgent Care Complex does not change the conclusion that the Zoning Changes, overall, were reasonably related to advancing a legitimate public interest.

105. First, as to the City's determination that a functioning hospital and emergency department were more important to public welfare than the proposed Outpatient and Advanced Urgent Care Complex (or, for that matter, more important than any other potential use of the Property that does not include a hospital and emergency department[3]), the Court cannot say on this record that the City's conclusion was

---

[3] On November 16, 2017, MemorialCare submitted a Supplemental Status Report (Dkt. 49) notifying the Court that MemorialCare has abandoned its plans for the Outpatient and Advanced Urgent Care Complex, and is instead proposing an academic and clinical facility to address Alzheimer's disease, dementia, and other cognitive care needs of seniors (the "Senior Cognitive Care Institute"). Because the City's decision to enact the Zoning Changes was made when MemorialCare was proposing to build the Outpatient and Advanced Urgent CareComplex—which means that the administrative record only contains documents and City Council hearing transcripts regarding the proposed outpatient Complex—the Court will conduct its analysis based on evidence about the proposed Complex rather than the newly proposed Senior Cognitive Care Institute. However, the Court notes that based on the information currently before the Court

(footnote continued)

incorrect, unsupported by evidence, or against the public interest. Balancing competing considerations to determine which of two seemingly beneficial uses is in the public's best interest is usually the province of legislative bodies like the City Council, given that such determinations entail subjective value determinations about what benefits should be prioritized. Here, as detailed above, the City had rational reasons to believe that maintaining a hospital and ER was in the public interest, and after considering arguments on both sides and following the legislative process, the City used its zoning powers to enforce its value determination that maintaining a hospital was a top priority and in the best interest of the residents of San Clemente and the south Orange County region.[4] *See, e.g.*, AR 74 (City Council member

---

regarding the Senior Cognitive Care Institute, the analysis and conclusions set forth below would not be fundamentally different if the Court used the proposed Senior Cognitive Care Institute in its analysis instead. Of course, if the City determines that the Senior Cognitive Care Institute would also be in the public interest and is a higher priority than a hospital and emergency department, it could take action to permit the Institute at the Property.

[4] It may be worth noting that just because a hospital appears economically unprofitable to its operator does not mean that keeping the hospital open is against the public interest. First, the economics for the hospital operator might not match the cost-benefit calculation for the City and thus for the broader public interest. For example, the City might believe that subsidizing the operation of the hospital and ER is worth the cost because it saves the City having to pay additional costs in emergency service coverage, *see* AR 4094–95, not to mention the value of the lives that might be saved by reduced transport times and the value of other public welfare and economic benefits that a functioning hospital might have for the City. In other words, the hospital may have positive externalities for the public good that are not reflected in the balance sheet of the hospital's operator but are recognized by the City, and thus might cause the City to make a different determination about whether continuing to operate a hospital would be beneficial. Put differently, the City might consider in its analysis benefits to the public good, the value of which may be difficult to quantify monetarily, that are not necessarily included in the market analysis done by the hospital operator about whether running the hospital makes economic sense. Ultimately, MemorialCare's balance sheet does not capture all the public benefits provided by an operating hospital, and thus does not necessarily dictate whether maintaining the Hospital is in the public interest.

More broadly, the public interest does not always align with economic realities, and market pressures should not always dictate governmental decisions in the public interest. For example, many would agree that it is in the public interest to provide basic services to all citizens, regardless of their ability to pay market rate for those services. Thus, governments often take action to subsidize or publically provide widespread access to services important to the public welfare, from schooling to municipal water delivery to cultural programs. This is their prerogative, if not a core

(footnote continued)

explaining that his "biggest concern" is not whether someone would be able to obtain outpatient services like knee surgery in San Clemente as a result of the proposed Outpatient and Advanced Urgent Care Complex, because those medical services are available "all over Orange County," but rather whether emergency services are available locally because "literally, seconds could mean the difference between life and death"). Whether that decision was wise or sufficiently accounted for trends in the healthcare industry the Court cannot say, but the Court also cannot conclude that the City's decision was totally unrelated to the public interest or so patently unreasonable as to warrant invalidating the Zoning Changes. *See Carrancho*, 111 Cal. App. 4th at 1265 ("The court does not 'weigh the evidence adduced . . . or substitute its judgment for that of the [City], for to do so would frustrate [the] legislative mandate.'" (citation omitted)); *Associated Home Builders*, 18 Cal. 3d at 605 ("The courts may differ with the zoning authorities as to the 'necessity or propriety of an enactment,' but so long as it remains a 'question upon which reasonable minds might differ,' there will be no judicial interference with the municipality's determination of policy." (citation omitted)).

106. Second, while MemorialCare repeatedly asserts that the Zoning Changes were against the public interest because they denied South Orange County residents the

_____

part of their mission. Of course, in seeking to achieve such public interest goals, a government cannot force a private entity to provide the desired service against its will, nor can the government take property for its desired public use without just compensation. *See Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980) ("The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest."), *abrogated by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). Whether the City took MemorialCare's property in whole or in part when it placed additional zoning restrictions on the Property is an important issue that remains to be litigated, but for the reasons described above the City may believe that having to compensate for any such taking is a worthwhile investment if it ensures provision of emergency services to the residents of San Clemente. *See* AR 30 ("I don't know what the cost of a lawsuit is. I don't. Maybe it's $1.2 million. You might remember that is the same number this City is going to have to spend every year for a new ambulance and the personnel required to run it. What about the first child who drowns at the pier? What price do we put on that child?").

benefits of the proposed Outpatient and Advanced Urgent Care complex, MemorialCare did not provide evidence that suggested or established an urgent regional need for such a Complex. *See, e.g.*, AR 1524–25 (ranking mental health and substance abuse as highest priorities for community health needs). Thus, MemorialCare has not carried its burden to show that preventing the construction of the Outpatient and Advanced Urgent Care Complex necessarily harmed the regional public welfare. *See Associated Home Builders*, 18 Cal. 3d at 610 (concluding that the plaintiff had not carried its burden to rebut the presumptive constitutionality of an exclusionary ordinance that prohibited issuance of further residential building permits until certain standards where met where "plaintiff assert[ed] the existence of an acute housing shortage in the San Francisco Bay Area, but present[ed] no evidence to document that shortage or to relate it to the probable effect of the Livermore ordinance"); *see also Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1313 ("[I]t is incumbent on plaintiff to produce sufficient evidence from which the court can make such findings as to the physical facts involved as will justify it in concluding, as a matter of law, that the ordinance is unreasonable and invalid.").

107. And even if MemorialCare had established a general regional need for its Outpatient and Advanced Urgent Care Complex, that still would not per se mean that the Zoning Changes were contrary to the public interest. *See Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1313–14 ("It is not sufficient for [a plaintiff] to show that it will be more profitable to him to make other use of his property, or that such other use will not cause injury to the public . . . ." (citation omitted)). Ordinance 1616 does not entail a blanket prohibition on outpatient and urgent care complexes in the City, but rather, according to MemorialCare, denies San Clemente residents the ability to obtain urgent care and other outpatient services *at the Property*. As a result, Ordinance 1616 does not entail the same type of potential "significant spillover effects" on the broader region that were of concern in *Associated Home Builders*. *See City of Del*

*Mar*, 133 Cal. App. 3d at 408 (discussing *Associated Home Builders*, 18 Cal. 3d. 582, and explaining that because the ordinance in that case "precluded new residential construction within the city, it had the effect of shifting the burden of providing new housing to other communities in the San Francisco Bay area—a substantial spillover").

108. Thus, MemorialCare's allegation that the Zoning Changes harm the public by denying the benefits of the proposed Complex is insufficient to overcome the presumption that Ordinance 1616 is valid. That alleged harm is not supported by sufficient record evidence, nor is it the broad type of harm that shifts burdens to other cities in the region. *See id.* at 410 (commenting that where city is "not able to shift the entire burden of its zoning decision to other municipalities in the region," the city's "action is considerably less suspect").

109. Beyond emphasizing the denial of the Complex's potential public benefits, MemorialCare does not provide any evidence that using the Property for a hospital and emergency department will have any negative impacts on the regional welfare. MemorialCare's challenge to Ordinance 1616's relationship to the regional welfare is therefore even weaker than the challenge in *City of Del Mar v. City of San Diego*, where the challenged ordinance was deemed valid despite its "substantial adverse environmental impacts on the San Diego region." *City of Del Mar*, 133 Cal. App. 3d at 404, 407 ("[A]lthough it is undisputed the project will have numerous adverse environmental impacts on the region, we nevertheless conclude that San Diego did not abuse its discretion in approving the steps at issue here as a rational accommodation of the social, economic and environmental interests with which the city must concern itself.").

110. In contrast to MemorialCare's failure to produce evidence that maintaining a hospital would have negative impacts, the City pointed to evidence that closure of the Hospital would adversely impact the region by increasing transport times and

impacts to other South Orange County hospitals, at least one of which was already on diversion some days of the year due to high patient volumes. Thus, the City considered the regional impacts of its decision to enact the Zoning Changes, and reasonably determined that maintaining a hospital at the Property supported the region's public welfare.

111. Nevertheless, MemorialCare claims that there is no evidence showing that the City considered any competing interests or attempted to make a reasonable accommodation of any interests, especially those of MemorialCare. MemorialCare thereby appears to suggest that the City did not sufficiently protect MemorialCare's property interests. But "the mere fact that some hardship is experienced [by a property owner] is not material, since 'Every exercise of the police power is apt to affect adversely the property interest of somebody.'" *Wilkins v. City of San Bernardino*, 29 Cal. 2d 332, 338 (1946) (citation omitted).

112. Moreover, the City here acted for the benefit of the public at the cost of private property interests (MemorialCare's interests), which makes it more likely that the Zoning Changes are valid than if the City had done the opposite. For example, in *Arnel II* the court determined that an ordinance, which suddenly disallowed a planned moderate income housing development, advanced only private interests, commenting that "the initiative ordinance is not rationally related to the general regional public welfare, but, at best, to conserving the interests of the adjoining property owners and residents of the immediate area." *Arnel II*, 126 Cal. App. 3d at 337; *see also Arcadia Dev. Co.*, 197 Cal. App. 4th at 1539 (noting that the ordinance in *Arnel II* "completely ignor[ed] the public interest and favor[ed] only the private interests of adjoining landowners"). In contrast, here the Zoning Changes were intended to benefit the public at large; MemorialCare has not alleged that the City was seeking to favor any particular private interests or property owners. This case is therefore more in line with *Arcadia*, where a court upheld an ordinance prohibiting development of

the Arcadia property after finding that the ordinance was "plausibly and rationally related to the public interests of halting urban sprawl and maintaining City's rural character," and that "[t]he only competing interest is [the property owner's]." *Arcadia Dev. Co.*, 197 Cal. App. 4th at 1539.

113. In addition, the City did attempt to accommodate MemorialCare's competing interests at least to some extent by allowing accessory uses alongside the Hospital. Specifically, the City did not outlaw the Outpatient and Advanced Urgent Care Complex facilities altogether—those facilities are allowed at the Property as long as a hospital is also maintained. Thus, the City Council believed that they were not precluding outpatient services and their potential benefits, but rather that they were accommodating the two interests of providing emergency care and providing advanced outpatient care. *See* AR 72 (City Council member confirming that Zoning Changes still permitted an urgent care center, outpatient facility, surgery center, and medical office building at the Property if the hospital and emergency department were kept open). *Compare Arnel II*, 126 Cal. App. 3d at 340 ("[T]here was not even an attempt to accommodate competing interests on a regional basis, and we have no hesitancy in concluding that the initiative ordinance, which completely precludes development of multiple family residences in the area, does not effect a reasonable accommodation of the competing interests on a regional basis and is therefore not a valid exercise of the police power.").

114. For the foregoing reasons, the record shows that the City sufficiently considered and attempted to accommodate the various interests at stake while acting on its determination that a hospital use should be prioritized over outpatient services in order to safeguard the public welfare.

115. Nevertheless, MemorialCare also contends that the Zoning Changes were impermissible because there is no factual support in the record to show that the City considered whether the Zoning Changes were likely to bring about the result that the

City desired—either forcing MemorialCare to keep the Hospital open or compelling its sale to another healthcare concern. According to MemorialCare, the Zoning Changes will in fact not cause the hospital to reopen, because MemorialCare has no intention of selling the Property to another operator and asserts that it is economically infeasible for MemorialCare itself to continue operating the Hospital. MemorialCare argues that the Zoning Changes are therefore not in the public interest, because they will cause the Property to be used for nothing at all, thereby depriving the public of the benefits of MemorialCare's proposed medical facilities. MemorialCare claims that the Zoning Changes simply prevent any feasible use of the Property because they do not lighten the financial burdens of operating a hospital on the Property, they cannot reverse the sharp declines in the number of patients sustained by MemorialCare during the prior five years, and they cannot address the serious issue that small, low-volume hospitals too often cannot provide safe, high-quality health care to the very patients they are meant to serve. For these reasons, MemorialCare argues that the City failed to establish that the Zoning Changes were reasonably related to the goal of keeping the Hospital open.

116. However, MemorialCare's argument that the City provided no evidence that the Zoning Changes would make it more likely that a hospital would remain open on the Property flips the burden of proof. Under the applicable standards, MemorialCare has the burden to provide evidence establishing that the Zoning Changes have no relation to the public welfare or are arbitrary and capricious. *See Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1309 ("The party challenging a zoning ordinance . . . bears the burden of producing sufficient evidence from which the trier of fact may conclude that the ordinance is unreasonable and invalid." (citations omitted)).

117. At this stage, MemorialCare has not provided sufficient evidence to prove that no hospital of any size can be maintained on the Property. Although there is evidence that the Hospital was economically unsustainable under the conditions under which it

was operating shortly before its closure, MemorialCare has not shown that no hospital of any size or with any operational plan could successfully be maintained at the Property, even in conjunction with any of the many other accessory uses that are permitted on the Property under the RMF1 zoning designation. *See* AR 28–29 (resident commenting that MemorialCare itself caused the decline in patient count at the Hospital by pulling certain services, suggesting that a different operational plan might make the Hospital feasible). Nor is it clear that the City would be unwilling to provide additional incentives or financial support that could help make a hospital feasible. *See* AR 73–74 (City Council member stating, "we would like to be [MemorialCare's] partners in reinvigorating this hospital, investing in this hospital, and making it an anchor point for our citizens").

118. Accordingly, it would be speculative to conclude on this record that operating a hospital at the Property is not possible under current zoning, and the Court will not engage in such speculation to invalidate the Zoning Changes. *See City of Del Mar*, 133 Cal. App. 3d at 414 (finding that it would be "premature to evaluate" certain argument about ordinance's relationship to the regional welfare, and declining to invalidate ordinance on that basis).

119. And the Court cannot say that the Zoning Changes fail to increase the probability— even only slightly—that a hospital will be maintained on that Property. If the Zoning Changes had not been enacted, it seemed almost certain that MemorialCare would demolish the Hospital and replace it with the proposed Outpatient and Advanced Urgent Care Complex. The Zoning Changes at least keep open the possibility that the Hospital will be reopened in some form in the future.

120. For all the foregoing reasons, MemorialCare has failed to carry its burden to provide sufficient evidence to establish that the Zoning Changes are not in the public interest. *See Associated Home Builders*, 18 Cal. 3d at 589 ("[P]laintiff presented no evidence to show that the ordinance's standards were unreasonable or unrelated to their

1    apparent objectives of protecting the public health and welfare.").

2    121. The City adequately considered regional impacts and the competing interests at stake,

3         and the City's conclusion that the Zoning Changes are reasonably related to the

4         public welfare is supported by record evidence.

5    122. Next, MemorialCare argues that the Zoning Changes must be invalidated because the

6         City acted in a manner that was arbitrary and capricious when it singled out only the

7         Property for a hospital use requirement and reversed in early 2016 the land use

8         designations that had been methodically devised during the Centennial General Plan

9         planning process that took place from 2009 to 2014.

10   123. As discussed above, however, the Zoning Changes were in many ways consistent

11        with the General Plan. The Centennial General Plan sought to implement policies to

12        support the Hospital, and nowhere did the Plan explicitly contemplate or mention the

13        scenario of the Hospital closing. It is possible that during the general planning

14        process nobody thought to create a distinct zoning designation for the Property

15        because they simply assumed that the Hospital would be maintained at the Property,

16        which was zoned to permit the ongoing hospital use. MemorialCare's announcement

17        that it was considering closing and replacing the Hospital constituted a change in

18        circumstances that spurred the City to act. Because the City followed the required

19        land use and legislative processes, its enactment of Ordinance 1616 was not

20        capricious. *Compare Arnel II*, 126 Cal. App. 3d at 337 (commenting that suddenly

21        rezoning a property in a way contrary to the general plan "without any significant

22        change in circumstances and without considering appropriate planning criteria" was

23        "arbitrary and discriminatory," and concluding that the zoning classification at issue

24        in that case "was selected purely capriciously without consideration of appropriate

25        planning or land use criteria").

26   124. Second, given that the City determined that maintaining a functioning hospital and

27        emergency department in the City was in the public interest, their selection of the

28

                                            37

Property as the parcel that should be spot zoned to house a hospital was anything but arbitrary. The City noted that the Property is ideally situated to serve this public purpose because it is optimally located on a major arterial freeway, adjacent to an I-5 freeway offramp; it is a relatively large parcel (6.6 acres); and it has successfully served this public purpose for decades. In addition, the Hospital is located next to a fire station and nearby medical facilities. *See* AR 296 (Critical facilities map illustrating proximity of fire station), 1284 (noting nearby medical facilities). The large lot size allows for flexibility in growth and the ability to respond to future growth needs. *See* AR 974. MemorialCare has not shown that any other property in the City shares these important attributes. *See Arcadia Dev. Co.*, 197 Cal. App. 4th at 1538–39 (finding that the municipality had a rational reason for prohibiting development of the particular property at issue where "the size and location of the Arcadia property are attributes shared by no other parcel" (citation omitted)).

125. In addition, the Property is already in a medical focus area with established medical facilities. In fact, the Hospital is intended to serve as the anchor for the Camino de Los Mares medical focus area. Thus, the land uses surrounding the Hospital have supported the Hospital and emergency medical facility use for decades, and are compatible with the re-zoning of the Property to RMF1. *Compare Skalko v. City of Sunnyvale*, 14 Cal. 2d 213, 216 (1939) (finding the application of a land use restriction to plaintiff's property was void where the property was "entirely unsuited" for the designated residential use due to the adjoining cannery, which made continuous noise and was thus incompatible with a residential use).

126. In sum, the City did not select a random parcel in a random part of the City to be zoned as RMF1 without any reason. The City's decision to spot zone the Property— as opposed to some other parcel of land—had a rational basis and was therefore not arbitrary.

127. Ultimately, the City had a rational basis, supported by evidence, for determining that

the Zoning Changes were in the public interest. "The settled rule of this court is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question." *Wilkins*, 29 Cal. 2d at 339 (quoting *Zahn v. Board of Public Works*, 274 U.S. 325, 328 (1927)). MemorialCare has not carried its burden to establish that the Zoning Changes were patently unreasonable, and thus has not adequately rebutted the presumptive validity of the City's legislative action. Because the Zoning Changes were neither arbitrary nor capricious, the City's enactment of Ordinance 1616 was permissible spot zoning that sought to advance the regional welfare. *See Foothill Cmtys. Coal.*, 222 Cal. App. 4th at 1311–19; *Cty. of Del Norte*, 71 Cal. App. 4th at 972–73 ( "Mandate will . . . lie to correct the exercise of discretionary legislative power, but only if the action taken is fraudulent or so palpably unreasonable and arbitrary as to reveal an abuse of discretion as a matter of law. This test is highly deferential, as it should be when the court is called upon to interfere with the exercise of legislative discretion by an elected governmental body." (citations omitted)).

**B. Deprivation of All Feasible Use**

128. MemorialCare also argues that the Court should issue a writ of mandate invalidating the Zoning Changes on the basis that the Zoning Changes deprived MemorialCare of all feasible use of the Property. Specifically, MemorialCare claims that requiring a hospital use on the Property in order for the Property to be used at all deprives the Property of all feasible use because maintaining a hospital is infeasible due to economic realities and safety concerns.

129. However, MemorialCare fails to proffer sufficient legal support to establish that deprivation of all feasible use is a ground for issuing a writ of mandate under California law. MemorialCare cites just one sentence from one case, in which the California Supreme Court noted that plaintiffs have the "right to seek judicial invalidation of zoning which is arbitrary and unreasonable, which bears no

reasonable relationship to the regional welfare, or which deprives them of substantially all use of their land." *Arnel I*, 28 Cal. 3d at 521 (citations omitted). However, the case cited by the California Supreme Court in *Arnel I* as support for the notion that plaintiffs can seek judicial invalidation of zoning which deprives them of substantially all use of their land is a case that does not involve a petition for writ of mandate, but rather a cause of action for inverse condemnation and a cause of action for declaratory relief based on the assertion that the zoning ordinance at issue took the plaintiffs' property without just compensation. *See Agins v. City of Tiburon*, 598 P.2d 25, 27 (Cal. 1979), *aff'd*, 447 U.S. 255 (1980), *abrogated by First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304 (1987). Thus, while the California Supreme Court commented that "judicial invalidation" of zoning provisions could be sought for deprivation of a property's feasible use, the Court did not state that such judicial invalidation should be accomplished through a writ of mandate, rather than by adjudicating takings claims, nor did it cite to any cases in which a writ of mandate was issued on takings grounds. *See id.*

130. Moreover, even if the Court were to find that the Zoning Changes deprived MemorialCare of all feasible use of the Property, it is not clear that issuing a writ of mandate requiring the City to rescind the Zoning Changes—as opposed to paying MemorialCare just compensation for taking their property—would be the appropriate remedy. The Fifth Amendment does not bar completely the taking of property for a public purpose—it simply requires that a government fairly compensate a property owner when it effects such a taking. *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) ("The [Takings] Clause expressly requires compensation where government takes private property 'for public use.' It does not bar government from interfering with property rights, but rather requires

compensation 'in the event of otherwise proper interference amounting to a taking.' (quoting *First English Evangelical Lutheran Church*, 482 U.S. at 315)). Thus, as long as the City's Ordinance 1616 is not otherwise impermissible—"for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process"—the ordinance can stand even if it effects a taking, as long as the City fairly compensates MemorialCare. *See Lingle*, 544 U.S. at 543. Put another way, it is the City's prerogative to take the Property for the public purpose of maintaining a hospital use if the City so chooses, but to comply with the Fifth Amendment the City must fairly compensate the Property owner—MemorialCare—for any such taking. As a result, the Court is not convinced that it has the authority to issue a writ of mandate to rescind the Zoning Changes purely on a takings basis.

131. In any case, even if the Court has the authority to issue a writ of mandate on the basis that the Zoning Changes deprived MemorialCare of all feasible use of the Property, the Court declines to reach that issue at this stage of the proceedings. The parties explicitly agreed to bifurcate trial of the petition for writ of mandate from adjudication of the remaining claims, which include claims for inverse condemnation and violation of civil rights under the Fifth Amendment (i.e., a takings claim). *See* FAC ¶¶ 60–80. Determining whether the Zoning Changes deprived MemorialCare of all feasible use of the Property would effectively require the Court to determine whether the Zoning Changes effected a taking and thus to reach claims that were explicitly bifurcated and reserved. Moreover, the deprivation of all feasible use issue should not be adjudicated based solely on a closed administrative record that contains evidence of the City's process and decision to enact Ordinance 1616 but not evidence of the actual effect of that Ordinance on the Property and its feasible uses. *See Avenida San Juan*, 201 Cal. App. 4th at 1264–65 (in similar case against City of San Clemente where trial of mandamus petition had been bifurcated from trial of inverse condemnation claim, trial judge visited the property at issue, heard

testimony from thirteen witnesses, and considered various exhibits during the second trial phase before deciding that "the City had deprived the owners of all economically viable use of the parcel" and had effected a regulatory taking of the parcel).

132. For the foregoing reasons, at this stage the Court declines to reach the merits of MemorialCare's claim that the Zoning Changes deprived MemorialCare of all feasible use of the Property. While it is certainly plausible that the City effected at least a partial, if not a complete, taking of the Property by enacting Ordinance 1616, pursuant to the parties' stipulation such claims are to be decided at a later stage, when the parties can also present the Court with additional evidence regarding the effect of the Ordinance. *See Skalko*, 14 Cal. 2d at 216 ("[T]he police power must be applied to existing conditions. . . . The question, therefore, is whether under the facts shown by the appellant his rights are now being invaded by the existence and maintenance of the ordinance.").

**C. Creation of A Monopoly**

133. Finally, Memorial Care argues that the Court should issue a writ of mandate invalidating the Zoning Changes on the basis that the Zoning Changes create an illegal monopoly. Specifically, MemorialCare points to the fact that, with the express intention of creating a favorable monopoly, the City disallowed a hospital use everywhere in the City except for at the Property, and claims that doing so violated California law that prohibits a municipality from exercising its zoning powers to create a monopoly in favor of a private person.

134. As an initial matter, it is not clear that Petitioners have standing to challenge a purported monopoly created in their favor. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) ("The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." (citations omitted)).

135. In any case, California law permits zoning that has a direct and intended effect of regulating economic competition, so long as the primary purpose of the zoning action is to achieve a valid public purpose. The only constraint is that a city may not legislate solely to serve impermissible anti-competitive private purposes, such as providing a favored private business with monopoly power or excluding an unpopular company from the community. *See Hernandez v. City of Hanford*, 41 Cal. 4th 279, 296–97 (2007) ("[E]ven when the regulation of economic competition reasonably can be viewed as a direct and intended effect of a zoning ordinance or action, so long as the primary purpose of the ordinance or action—that is, its principal and ultimate objective—is not the impermissible *private* anticompetitive goal of protecting or disadvantaging a particular favored or disfavored business or individual, but instead is the advancement of a legitimate *public* purpose—such as the preservation of a municipality's downtown business district for the benefit of the municipality as a whole—the ordinance reasonably relates to the general welfare of the municipality and constitutes a legitimate exercise of the municipality's police power." (citations omitted)).

136. Here, although there is no doubt that the City intended to create a hospital-use monopoly by enacting the Zoning Changes, it did so with the primary public purpose of incentivizing the continued operation of a hospital at the well-located Property. Petitioners have offered no evidence that Ordinance No. 1616 was passed with an impermissible private purpose of providing a particular favored private business with monopoly power or excluding an unpopular company from the community.

137. Accordingly, Petitioners have not established that the City unlawfully exceeded its zoning powers by creating a hospital-use monopoly when it enacted the Zoning Changes. *See Wal-Mart Stores, Inc. v. City of Turlock*, 138 Cal. App. 4th 273, 302 (2006) ("[W]hile the Ordinance likely will have an anticompetitive effect . . . , that incidental effect does not render arbitrary an Ordinance that was enacted for a valid

43

purpose.").

IV. **CONCLUSION**

For the reasons explained above, the Court DENIES MemorialCare's petition for a writ of mandate. After considering various reports and stakeholder comments, the City determined that maintaining a hospital and ER for local residents was in the public interest, and the City adopted the Zoning Changes with the legitimate public purpose of ensuring the maintenance of a hospital and emergency department at the Property. On the current record, MemorialCare has not established a basis on which the Court may issue a writ of mandate invalidating the Zoning Changes as arbitrary, capricious, totally unsupported by evidence, or creating an impermissible monopoly for anti-competitive private purposes.

Whether Ordinance 1616 will ultimately have its intended effect of causing a hospital to reopen on the Property remains unclear. At a minimum, the Zoning Changes keep that possibility open and the Court cannot say that the Zoning Changes will have absolutely no impact on, or are completely unrelated to, the goal of maintaining a running hospital and ER in the City. However, the impact of the Zoning Changes and the feasibility of maintaining a hospital will likely be litigated in the next phase of trial, when the Court considers, among other things, whether the Zoning Changes deprived MemorialCare of all feasible use of the Property and effected a taking for which just compensation must be paid.

DATED: February 6, 2019

_David O. Carter_
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE